IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| United States of America *ex rel.* Andrea Binns, | ) ) ) | Case No. 7:22-cv-04355-JDA |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **OPINION AND ORDER** |
| Spartanburg Regional Health Services District, Inc. d/b/a Spartanburg Regional Healthcare System; Foothills Anesthesia Consultants, P.C.; Mark Aycock; Dr. Dean Davis; Phil Feisal; Mary Jane Jennings; Dr. Nickole Teel; Bruce Holstien, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

This matter is before the Court on a motion to dismiss or, in the alternative, for a more definite statement by Defendants Spartanburg Regional Health Services District Inc. ("SRHS"), Mark Aycock, Dr. Dean Davis, Phil Feisal, Mary Jane Jennings, Dr. Nickole Teel, and Bruce Holstien (collectively, "SRHS Defendants"). [Doc. 48.] Plaintiff-Relator Andrea Binns ("Binns") filed a response to SRHS Defendants' motion [Doc. 55], and SRHS Defendants filed a reply [Doc. 60]. As the Court will explain, SRHS Defendants' motion is granted in part and denied in part, and the Court will allow Binns to file a third amended complaint.[1]

_____

[1] Also pending are motions by Defendant Foothills Anesthesia Consultants, P.C. ("Foothills") for judgment on the pleadings and by Binns to strike Foothills' motion. [Docs. 56; 58; *see* Docs. 62; 64.] Binns has not yet filed a response to Foothills' motion, and both parties appear recognize that the Court's ruling on SRHS Defendants' motion

## BACKGROUND

On December 1, 2022, Binns filed her qui tam Complaint under seal, as required by the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–33. [Doc. 1.] On May 10, 2024, the United States (the "Government") filed a notice of election to decline to intervene. [Doc. 21.] As the notice explained, the FCA provides that, following the Government's declination, Binns may maintain the action and pursue her FCA claims on behalf of the Government. *See* 31 U.S.C. § 3730(b)(1), (4). Also on May 10, the Court ordered that the matter be unsealed. [Doc. 22.] Binns filed an Amended Complaint on June 18, 2024. [Doc. 25.] On July 24, 2024, the Court granted a motion by Binns to amend her Amended Complaint to correct a scrivener's error, and Binns filed her Second Amended Complaint (the "SAC") [Docs. 32; 33; *see* Doc. 30.]

The SAC alleges unlawful schemes by Defendants to defraud the Government by knowingly presenting, or causing or conspiring to be presented, materially false and fraudulent claims to the Government's Medicare, TRICARE, and Medicaid programs (the "Government Programs")[2] for reimbursement, in knowing violation of the FCA. [Doc. 33 ¶¶ 367–93.] Binns also alleges that Defendants violated the FCA by terminating her for

---

to dismiss has the potential to moot these motions. [*See* Docs. 62; 64.] In light of this Opinion and Order directing that Binns amend the Second Amended Complaint, both of these motions indeed are moot. Additionally, SRHS Defendants have also filed a motion to consolidate cases [Doc. 69], which the Court does not address today.

[2] "Medicare is a federal health care program principally for older Americans, administered by the U.S. Department of Health and Human Services, largely through delegation to private insurance companies." *United States v. Conner*, 262 F. App'x 515, 516 n.1 (4th Cir. 2008). "Medicaid is a federal health care program for those with insufficient financial resources, administered by state governments." *Id.* "TRICARE is a federal healthcare program that covers members of the uniformed military services of the United States." *United States ex rel. Mathewson v. Premier Med., Inc.*, No. 6:18-cv-165-TMC, 2023 WL 9060896, at *1 n.2 (D.S.C. Sept. 28, 2023) (citing 10 U.S.C. § 1071 et seq.).

attempting to stop Defendants' FCA violations and that they violated state law by terminating her for refusing to participate in illegal activities. [*Id.* ¶¶ 394–408.]

**The Parties**

### *Binns*

Binns is a licensed certified registered nurse anesthetist ("CRNA") and was employed as a full-time CRNA contractor employee with SRHS from about November 2007 until about July 2016, when she became SRHS's Chief CRNA. [*Id*. ¶¶ 20–21.] She worked as a full-time employee with SRHS from about July 2016 until about July 14, 2022. [*Id*. ¶ 22.]

In the course of her employment as Chief CRNA, Binns supervised over 100 CRNA, nurse practitioner ("NP"), and anesthesia technician ("AT") employees in SRHS's anesthesia department. [*Id*. ¶ 24.] Her responsibilities at SRHS included management, oversight, and/or supervision of the following: developing the budgets for, and monitoring the revenues of, the anesthesia departments; responding to the CRNAs' needs and concerns; implementing and upholding SRHS's policies; developing and maintaining scheduling for the anesthesia departments; interfacing with and providing resources to the CRNAs, NPs, and ATs; overseeing compliance with Det Norske Veritas and/or the Centers for Medicare and Medicaid Services Guidelines; managing the hiring and firing of non-physicians within the anesthesia departments; developing and initiating Enhanced Recovery After Surgery protocols at all facilities; acting as Epic[3] IT Governance Anesthesia lead for three campuses; providing Epic subject matter expertise; maintaining

---

[3] Epic is SRHS's electronic medical records or electronic health records system. [Doc. 33 ¶ 27.]

clinical responsibility for the anesthesia departments at all campuses; and providing Quality Assurance Process Improvement for the anesthesia departments for all campuses.  [*Id*. ¶ 27.]

### SRHS

SRHS is a private, not-for-profit hospital located in Spartanburg County, South Carolina and was, from approximately 2012 through at least 2022, the recipient of federal funds from the Government Programs.  [*Id*. ¶ 29.]

### Foothills

Foothills was, at all times relevant to this case, an entity operating at SRHS facilities and has been the recipient of federal funds from the Government Programs.  [*Id*. ¶ 33.]  From about November 2012 through about July 2021, Foothills entered into one or more agreements with SRHS to provide anesthesia services and anesthesiologists to SRHS.  [*Id*. ¶ 37.]

### The Individual Defendants[4]

At all relevant times, Aycock was SRHS's chief operating officer; Dr. Davis, the chief medical officer for anesthesiology of the Medical Group of the Carolinas, which is a division of SRHS; Feisal, the president of perioperative services of SRHS; and Holstien, SRHS's president and chief executive officer.  [*Id.* ¶¶ 29, 38, 41, 44, 47.]  Jennings was, at all times relevant, SRHS's vice president of perioperative service, and, in or around 2021, became SRHS's chief nursing officer of Spartanburg Medical Center – Church Street Campus and Spartanburg Medical Center – Mary Black Campus.  [*Id.* ¶ 50.]  Dr.

---

[4] The Court refers to Aycock, Dr. Davis, Feisal, Jennings, Dr. Teel, and Holstien collectively as "the Individual Defendants."

Teel was, from about 2018 until 2021, an anesthesiologist at SRHS, and in 2021, she became the medical director of the Spartanburg Medical Center – Church Street Campus, the Spartanburg Medical Center – Mary Black Campus, and the Cherokee Medical Center.  [*Id.* ¶ 53.]

 **The Alleged Fraudulent Conduct**

Binns alleges that from approximately 2012 through 2022, Defendants knowingly and materially violated the FCA pursuant to one or more of the following schemes: (A) presenting false claims to the Government Programs for payment or approval for anesthesia health care services not performed (the "Non-Performed Services Scheme"); (B) forging or falsifying records of anesthesia health care services not performed, which records were material to false claims presented to the Government Programs for payment or approval (the "Forged Records Scheme"); and (C) presenting false claims to the Government Programs for payment or approval for anesthesia health care services rendered in knowing and willful violation of the Ethics in Patient Referrals Act (the "Stark Law"), 42 U.S.C. § 1395nn, and/or the Antikickback Statute ("AKS"), 42 U.S.C. § 1320a-7b (the "Stark-AKS Scheme").  [*Id*. ¶ 7.]

Many of Binns's allegations of fraud are related to Medicare's requirements for payment for certain services.  In particular, Binns alleges:

> 156.   Medicare generally provides for payment of anesthesiology services based upon three main categories: (1) "personally performed," (2) "medically directed," or (3) "medically supervised."  <u>Medicare Claims Processing Manual</u>, Chapter 12 — Physicians/Nonphysician Practitioners, § 50, Payment for Anesthesia Services.

> 157.   The Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248 ("TEFRA") is a statute that contains

language that permits an anesthesiologist to be paid for medically directing anesthesia services.

158. Per TEFRA, anesthesiologists are allowed to provide medical direction (to CRNAs, generally, or other qualified providers) for up to four concurrent cases. However, the federal Government will only pay for medical direction if the services meet all of the following conditions. The anesthesiologist must:

(1) Perform a pre-anesthetic examination and evaluation of the patient;
(2) Prescribe the anesthesia plan;
(3) Personally participate in the most demanding aspects of the anesthesia plan, including induction and emergence, when applicable;
(4) Ensure that any procedures in the anesthesia plan that are not performed by the physician are performed by a qualified individual;
(5) Monitor the course of anesthesia administration at frequent intervals;
(6) Remain physically present and available for immediate diagnosis and treatment of emergencies; and,
(7) Provide indicated post-anesthesia care.

42 C.F.R. § 415.110(a). These rules are known as the "TEFRA" rules or "medical direction" rules.

159. The anesthesiologist alone must document and attest in the patient's medical record that the seven TEFRA requirements listed above [(the "Seven Requirements")] have been satisfied. Regulations further require the physician to document in the patient's medical record that the [Seven Requirements] have been satisfied and must specifically document the anesthesiologist having performed the pre-anesthetic exam and evaluation, having provided the post-anesthesia care, and having been present during the most demanding procedures, including induction and emergence where applicable. 42 C.F.R. § 415.110(b).

160. "Medical direction" payments by [Centers for Medicare and Medicaid Services ("CMS")] are authorized when the medically directing anesthesiologist meets the [Seven Requirements] for anesthesia care furnished by a CRNA (or other qualified individual). 42 C.F.R. § 415.110(a).

6

> 161. *Medicare regulations permit a provider to bill for a service as "medically directed" only if the physician is directing the anesthesia services in no more than four concurrent cases. 42 C.F.R. § 415.110(a). Further, if the physician directs a student CRNA in any cases, the physician may direct no more than two cases concurrently. 42 C.F.R. § 414.46(d). The anesthesiologist cannot perform any other services while medically directing up to four concurrent cases. 42 C.F.R. § 415.110(a)(2).*
>
> . . . .
>
> 163. The <u>medically directed rate</u> applies where the anesthesiologist is directing two, three, or four concurrent anesthesia cases being performed by a medical professional that the anesthesiologist is medically directing, and that rate is 50% of the physician fee schedule for each case (as opposed to 100% for one case). 42 C.F.R. § 414.46(d).
>
> 164. The <u>medically supervised rate</u> applies where the anesthesiologist: (1) oversees more than four concurrent anesthesia procedures, or (2) performs other non-permitted services while directing four or fewer anesthesia procedures, or (3) does not meet all of the seven requirements for medical direction. 42 C.F.R. § 414.46(f); <u>Medicare Claims Processing Manual</u>, Chapter 12 – Physicians/Nonphysician Practitioners, § 50, Payment for Anesthesia Services.

[*Id.* ¶¶ 156–64 (emphasis added).]

In support of the Non-Performed Services Scheme, Binns alleges that

> Defendants have fraudulently presented, and/or caused or conspired to be presented, false claims to the Government for their anesthesiologists' (sometimes referenced as "MDAs") services not provided, including in one or more of the following circumstances: (A) MDAs not showing up at night for patients under anesthesia; (B) MDAs not showing up for emergence (patient coming out of anesthesia); (C) MDAs, who were providing medical direction to CRNAs for up to four anesthesia cases simultaneously, provided break coverage for individual CRNAs, and the MDAs were thus not immediately available to provide medical direction for the other cases; (D) MDAs allowing CRNAs to induce anesthesia to patients without MDAs present; (E) MDAs not immediately available but billing

for medical direction; (F) MDAs signing in on cases but not actually in OR room; (G) MDAs leaving the hospital and leaving one MDA to cover more than 4 rooms or cases; (H) a [second] MDA covering and performing a procedure for [first] MDA yet leaving the [first] MDA as the rendering provider in the medical record; (I) MDAs leaving the PACU/hospital[5] when patient was still receiving anesthesia treatment; (J) MDAs not present during critical parts of the anesthesia procedure; (K) MDAs not providing post-operative ("postop") care given as indicated in the medical record (i.e., no care provided after PACU), postop notes were constantly made without seeing the patient (they sometimes call the nurse and other times make it up), and no documented report to another provider or anesthesia [after visit summary] given to patient; (L) MDAs not performing a preoperative history or a prescribed plan of care prior to the case; and, (M) MDAs not monitoring the anesthesia patient during a procedure.

[*Id*. ¶ 8 (footnote added).]

In support of the Forged Records Scheme, Binns alleges

SRHS's and Foothills' anesthesiologists repeatedly forged their patients' medical records to indicate anesthesia services performed when, in fact, such services had not been performed. Pursuant to the Forged Records Scheme, MDAs removed medical records or charts of CRNA completing procedure and forged the medical records or charts to show that the MDAs completed the procedure (even though the MDAs did not perform them). For example, SRHS MDAs often falsely attested that they were present for induction when they were not present. MDAs at SRHS routinely call other MDAs to cover inductions and emergences of their assigned cases. The covering MDAs did not attest to their presence for induction, because of the potential of covering more than 4 ORs in violation of TEFRA. The assigned MDAs, who were not present, attested that they were present for induction.

[*Id*. ¶ 10.]

In support of the Starks-AKS Scheme, Binns alleges that

from about 2012 through 2021, SRHS had unlawful direct or indirect financial relationships and compensation

_____

[5] The PACU is the Post Anesthesia Care Unit.  [Doc. 33 ¶ 198.]

> arrangements with physician anesthesiologists which provided excess compensation to these physicians which was above fair market value, was not commercially reasonable, took into account the volume or value of the physicians' referrals of designated health services to SRHS, and was illegal remuneration under the Stark Law and AKS Statute. SRHS provided additional illegal remuneration to the physician anesthesiologists in the form of free office space, free use of a conference room, free computers, free meals and an exclusive services provision. At least one purpose of the illegal remuneration paid or provided by SRHS to the physician anesthesiologists was to induce referrals of designated health services to SRHS. The claims to the Government arising from these unlawful financial relationships and compensation arrangements between SRHS and anesthesiologists, as well as the illegal remuneration paid or provided to the anesthesiologists by SRHS, presented or caused or conspired to be presented by the Defendants, were false and fraudulent claims in knowing and willful violation of the Stark Law, AKS Statute and FCA.

[*Id*. ¶ 12.]

**The Alleged Retaliatory Termination**

Binns alleges that for years, she repeatedly reported to her superiors examples of medical billing fraud of the type included in the Forged Records and Non-Performed Services Schemes. [*E.g., id.* ¶¶ 62, 222, 233, 237–38, 246, 255.] Binns alleges that around early 2019, she suggested to Jennings and John Brown, Binns's superior at SRHS, that to help address and stop the billing frauds Binns had previously identified and reported, SRHS should talk to ABEO, a company that specialized in anesthesia billing, about reviewing SRHS's anesthesia billing. [*Id*. ¶¶ 224, 238.] After SRHS contacted ABEO, ABEO produced a report that included recommendations to prevent fraudulent billing that was occurring. [*Id*. ¶ 224.] Brown shared ABEO's findings with Binns, which included suggestions that SRHS bring the MDAs into SRHS as employees and hire ABEO to improve compliance, resolve or stop billing fraud issues, and receive a better return on

billing.    [*Id.*]    However, SRHS chose not to hire ABEO to implement those recommendations. [*Id.*]

Binns alleges that around late 2020, upon her suggestion, SRHS hired Enhanced Healthcare Consulting ("EHC") to review the anesthesia department as a whole, including billing.  [*Id.* ¶ 225.]  During the review, leaders of EHC visited SRHS's Mary Black Campus.  [*Id.*]  While there, the EHC leaders realized that an MDA was allowing a CRNA to go back and induce with other CRNAs without the MDA being present.  [*Id.*]  The EHC reviewer explained that that course of conduct resulted in billing fraud.  [*Id.*]  EHC recommended that SRHS hire the MDAs as employees and allow the CRNAs to operate at maximum scope of practice.  [*Id.*]  EHC also offered to take over the process of employment, to find SRHS a medical director, and to improve SRHS's compliance and the billing process.  [*Id.*]  However, SRHS did not follow EHC's recommendations.  [*Id.*]

Binns's final report of fraud that the SAC identifies was an email she sent to Dr. Teel and Division Director Bobbie Earles on July 7, 2022, concerning conduct that had allegedly occurred six days earlier (the "July 2022 Conduct").[6]  [*Id.* ¶ 255.]  Dr. Teel, who had been on vacation the day Binns sent the email, returned to SRHS the following Monday, July 11, 2022.  [*Id.* ¶ 263.]  Binns then received a meeting notification the

---

[6] The SAC alleges that on July 1, 2022, there were five anesthesia cases running concurrently; Dr. Michelle English's name was on the record for one of those cases—for a Medicare patient—and she was listed as medically directing a CRNA, but in fact Dr. English was not in the building for the entire case; Dr. Steven Hauck was the only anesthesiologist in the building, and he was supervising CRNAs in the other four cases under medical direction, two of which included Medicare patients; despite the fact that Dr. English was not in the building for part of the treatment, Dr. English was billed as providing medical direction; and despite the fact that Dr. Hauck was supervising CRNAs in more than four cases while Dr. English was out of the building, Dr. Hauck was billed as providing medical direction as well.  [*Id.* ¶¶ 251–60.]

following day for a meeting to be held on July 14. [*Id.* ¶ 264.] And on Wednesday, July 13, Dr. Teel indicated an investigation would be conducted concerning the July 2022 Conduct. [*Id.* ¶ 265.] However, on Thursday, July 14, 2022, SRHS terminated Binns's employment. [*Id.* ¶ 266.] Binns alleges that the reason SRHS gave for terminating her—that it was eliminating the position of Chief CRNA—was pretextual and that SRHS's real reason for taking adverse action against her was her efforts to stop the fraudulent billing. [*Id.* ¶ 23.]

**Binns's Causes of Action and Relief Requested**

Binns alleges claims for presenting false claims to the Government Programs in violation of 31 U.S.C. § 3729(a)(1)(A) ("Count I"); for making and using false statements and records in violation of 31 U.S.C. § 3729(a)(1)(B) ("Count II"); for reverse false claims in violation of 31 U.S.C. § 3729(a)(1)(G) ("Count III"); for conspiracy to commit FCA violations in violation of 31 U.S.C. § 3729(a)(1)(C) ("Count IV"); for retaliatory and discriminatory discharge in violation of 31 U.S.C. § 3730(h) ("Count V"); and for wrongful discharge in violation of public policy ("Count VI"). [Doc. 33 ¶¶ 367–408.] As her relief, Binns demands actual, compensatory, consequential, special, punitive, and treble damages, as well as civil penalties, interest, attorneys' fees and costs, back pay, and other remedies. [*Id.* at 102.]

## APPLICABLE LAW

**Rule 12(b)(6) Standard**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a claim should be dismissed if it fails to state a claim upon which relief can be granted. When considering a motion to dismiss, the court should "accept as true all well-pleaded allegations and

should view the complaint in a light most favorable to the plaintiff." *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, the court "need not accept the legal conclusions drawn from the facts" nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). Further, for purposes of a Rule 12(b)(6) motion, a court may rely on only the complaint's allegations and those documents attached as exhibits or incorporated by reference. *See Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 31–32 (4th Cir. 1985). If matters outside the pleadings are presented to and not excluded by the court, the motion is treated as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(d).

With respect to well pleaded allegations, the United States Supreme Court explained the interplay between Rule 8(a) and Rule 12(b)(6) in *Bell Atlantic Corp. v. Twombly*:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

550 U.S. 544, 555 (2007) (footnote and citations omitted); *see also* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 235–36 (3d ed. 2004) ("[T]he pleading must contain something more . . . than a bare averment that the pleader wants

12

compensation and is entitled to it or a statement of facts that merely creates a suspicion that the pleader might have a legally cognizable right of action.").

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. The plausibility standard reflects the threshold requirement of Rule 8(a)(2)—the pleader must plead sufficient facts to show he is entitled to relief, not merely facts consistent with the defendant's liability. *Twombly*, 550 U.S. at 557; *see also Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)). Accordingly, the plausibility standard requires a plaintiff to articulate facts that, when accepted as true, demonstrate that the plaintiff has stated a claim that makes it plausible the plaintiff is entitled to relief.[7] *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

**Pleading Fraud Under Rule 9(b)**

Claims of fraud are held to a heightened pleading standard. Rule 9(b) of the Federal Rules of Civil Procedure requires that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud. Malice, intent,

---

[7] "[E]ven after *Iqbal* and *Twombly*, a plaintiff may state a claim based 'upon information and belief,' especially if the facts are peculiarly within the defendant's knowledge and control, so long as an inference of culpability is plausible." *Dedrick v. Abilene Motor Express, Inc.*, No. 1:21CV00027, 2021 WL 5236817, at *6 (W.D. Va. Nov. 8, 2021); *see Wells v. Moore Cnty. Schs. Bd. of Educ.*, No. 1:23CV412, 2025 WL 1348491, at *6 (M.D.N.C. May 8, 2025).

knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The Fourth Circuit Court of Appeals has held that Rule 9(b) requires pleading with particularity the time, place, and contents of the false representations, as well as the identity of the person making the representations. *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). Rule 9(b) serves four purposes: (1) to put defendants on notice so that they have sufficient information to formulate a defense; (2) to protect defendants from frivolous suits; (3) to eliminate fraud actions in which all facts are learned after discovery; and (4) to protect defendants from harm to their goodwill and reputation. *Id.*

"[L]ack of compliance with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6)." *Id*. at 783 n.5. The Fourth Circuit has cautioned that "[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* at 784. Additionally, factual allegations based on "information and belief" are generally insufficient to satisfy Rule 9(b)'s heightened pleading standard in the absence of allegations of the specific facts upon which the belief is reasonably based. *See, e.g.*, *GovernmentCIO, LLC v. Landry*, No. CCB-20-0949, 2021 WL 1102333, at *5 (D. Md. Mar. 22, 2021) ("Pleading based on information and belief is permitted when essential information lies within the control of another party and when the pleading sets forth the specific facts upon which the belief is reasonably based."); *The N.C. Farmers' Assistance Fund, Inc. v. Monsanto Co.*, 740 F. Supp. 2d 694, 705 (M.D.N.C. 2010) (same); *Breckley v. Amway Corp.*, No. 6:89-540-17, 1989 WL 140397, at *5 (D.S.C.

14

Aug. 24, 1989) (finding the complaint "defective" because it included a number of factual allegations based on information and belief, which the court noted was "generally disallowed of pleadings pursuant to Rule 9(b)").

**Relevant Statutes**

As noted, Binns brings this action under the FCA, based on conduct some of which is in violation of the Stark Law and the AKS. [Doc. 33.] The FCA provides that any individual who

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
>
> (C) conspires to commit a violation of subparagraph (A)[ or] (B) . . . .
>
> . . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1) (footnote omitted).

The AKS prohibits any provider from

> knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or

item for which payment may be made in whole or in part under
a Federal health care program.

42 U.S.C. § 1320a-7b(b)(2).  The statute also states that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]."  *Id.* § 1320a-7b(g); *see United States v. Mallory*, 988 F.3d 730, 741 (4th Cir. 2021) ("A violation of the Anti-Kickback Statute . . . automatically constitutes a false claim under the [FCA].").

Finally, "[t]he Stark Law prohibits the government from paying *any* amount of money for claims submitted in violation of the law."  *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 386–87 (4th Cir. 2015) (citing 42 U.S.C. § 1395nn(g)(1)).  "The Stark Law expresses Congress's judgment that all services provided in violation of that law are medically unnecessary."  *Id.*

## DISCUSSION

SRHS Defendants argue that all claims against them should be dismissed with prejudice for failure to state a claim.  [Doc. 48-1 at 9–34.]  Alternatively, SHRS Defendants argue that to the extent the Court does not dismiss the SAC for failure to state a claim, the SAC is a shotgun complaint and Binns should be ordered to correct it pursuant to Rule 12(e) of the Federal Rules of Civil Procedure.  [*Id.* at 34–35.]  The Court will address Binns's claims seriatim.

**Counts I and II**

As previously stated, Counts I and II allege violations of 31 U.S.C. § 3729(a)(1)(A) and (B), respectively.  [Doc. 33 ¶¶ 367–78.]  SRHS Defendants first contend that the SAC's failure to adequately allege that any false claim was submitted to the Government Programs is fatal to all her claims.  [Doc. 48-1 at 9–13.]  They also argue that the SAC

16

fails to meet the heightened pleading standard required by Rule 9(b) of the Federal Rules of Civil Procedure and fails to make specific allegations against the Individual Defendants. [*Id.* at 14–26.]

To state a claim for violating either § 3729(a)(1)(A) or (B), a relator must allege four elements: "(1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due." *United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 193 (4th Cir. 2022) (internal quotation marks omitted).

### *Whether the SAC's Allegations are Generally Sufficient Regarding Submission of Claims to the Government Programs*

The Court begins, as SRHS Defendants have, by addressing whether the SAC adequately alleges that any false claim was submitted to the Government Programs. Because the FCA does not punish every type of fraud committed upon the government, a "central question" in an FCA case is whether a false or fraudulent claim was ever submitted to the government. *Harrison*, 176 F.3d at 785. A relator may establish submission of a false claim in two ways. First, a relator may "allege with particularity that specific false claims actually were presented to the government for payment" by describing "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *United States ex rel. Wheeler v. Acadia Healthcare Co.*, 127 F.4th 472, 491 (4th Cir. 2025) (internal quotation marks omitted). Alternatively, a relator may "allege that the defendant's fraudulent conduct necessarily led to the plausible inference that false claims were submitted to the government." *Id.*

17

With respect to the latter method for showing submission of a false claim, the Fourth Circuit Court of Appeals reasoned:

> [A]n FCA whistleblower need not "produce documentation or invoices at the outset of the suit," nor are they requested to have "specific knowledge of a company's financial and billing structure." [*United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 199 (4th Cir. 2018)]. If an FCA whistleblower "cannot allege the details of an actually submitted false claim, [the complaint] may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." [*United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)]. This court requires only "that plaintiffs connect the dots, even if unsupported by precise documentation, between the alleged false claims and government payment." *Grant*, 912 F.3d at 199. [The relator] adequately connects the dots.
>
> [The relator] provides multiple examples of false therapy notes that were repeatedly used to falsify patient records, identifying [the defendants'] staff who created and signed the notes, and specifying the dates and descriptions of the fictitious therapy sessions. She further describes the use of fraudulent "bibliotherapy" worksheets to create the impression that therapy had been provided. There can be little doubt that, if [the defendants] created these false notes, [they] billed for those services. It would "stretch the imagination" for [the defendants'] practitioners continually to record services that were not provided, but "to deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed.

*Id.* at 493. In the end, the Fourth Circuit concluded that the relator had adequately alleged all elements of her FCA presentment, false statement, false certification, and fraudulent inducement claims. *Id.* at 486–95. Nonetheless, the Fourth Circuit concluded that the relator sufficiently alleged those causes of action only as to the defendants' treatment facilities in North Carolina. *Id.* at 488. Although the relator also "attempt[ed] to reach [the defendants'] nationwide clinics through [the relator's] allegations that the practice of

18

falsifying group therapy notes is 'corporate policy,'" the Fourth Circuit held that she failed to satisfy the Rule 9(b) standard as to the centers outside North Carolina. *Id.* The Court reasoned that the standard for FCA pleadings "requires that [the relator] have substantial prediscovery evidence of the facts" and "[n]othing in [the relator's] complaint allow[ed] [the Fourth Circuit] to infer that the alleged 'corporate policy' in fact exist[ed]." *Id.* (cleaned up). Accordingly, the Fourth Circuit held that the relator's allegations "me[t] the [Rule 9(b)] pleading requirement only with regard to" the North Carolina clinics. *Id.* Thus, the court limited the scope of the FCA claims to actions allegedly taken by the defendants at their North Carolina facilities. *Id.* at 498.

Applying *Wheeler* to the allegations in the SAC, the Court concludes that Binns has adequately alleged presentment as to the Forged Records and Non-Preferred Services Schemes because she has sufficiently alleged that the fraudulent conduct necessarily led to the plausible inference that false claims were submitted to the Government Programs. Binns has described with significant indicia of reliability the misrepresentations in the medical charts that she alleges led to presentation of false claims to the Government Programs. She has well covered "the who, what, when, where, and how" of these schemes. *Id.* at 485. She has explicitly noted, in many instances, that her information was obtained from particular CRNAs working under her, and, with regard to some instances, she specifically alleged that she viewed the applicable medical charts and records. [*E.g.*, Doc. 33 ¶¶ 233, 246, 251, 253, 254.] She does not allege that she has specific knowledge that claims were presented to the Government Programs as a result of these false statements and fraudulent conduct. However, as the Fourth Circuit determined in *Wheeler*, "[t]here can be little doubt that, [if these falsities were placed in

the patients' medical charts, SRHS] billed for those services," and "[i]t would stretch the imagination for [SRHS's] practitioners continually to record services that were not provided, but to deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed." *Wheeler*, 127 F.4th at 493 (cleaned up). Accordingly, the Court concludes that "it does not matter that [Binns has] not yet produced a document submitted to [the Government Programs] citing false [medical records] and requesting compensation" for the services described. *United States ex rel. Va. v. Century Park Cap. Partners, LLC*, No. 7:21-cv-420, 2025 WL 1959356, at *18 (W.D. Va. July 16, 2025). Thus, the Court concludes that Binns has adequately alleged presentment as to the Forged Records and Non-Performed Services Schemes.

However, the SAC's allegations are insufficient to establish that any billing fraud continued after Binns's termination because the SAC does not allege that Binns possesses any information concerning events that occurred after she was terminated.[8] [*See generally* Doc. 33.] Accordingly, Binns cannot recover damages for claims made after her termination. *See United States ex rel. Mastej v. Health Mgmt. Assocs.*, 591 F. App'x 693, 709 (11th Cir. 2014) (holding that the relator's complaint satisfied Rule 9(b)'s particularity requirement only for claims during a certain period but not for claims alleged "only in a generalized and conclusory manner" when the complaint did "not offer any other

---

[8] The SAC does not make any specific allegations about any post-termination claims. Although it includes general allegations that "upon information and belief," the alleged schemes "continue" [*e.g.*, Doc. 33 ¶ 231], as noted, such conclusory allegations, with no indicia of reliability, are not well pled under Rule 9(b). *See Wheeler*, 127 F.4th at 488 (holding that an unadorned allegation that a particular corporate policy existed was inadequate under Rule 9(b) when nothing in the complaint allowed the court to infer that the alleged corporate policy existed); *GovernmentCIO, LLC*, 2021 WL 1102333, at *5.

indicia of reliability for [the] assertion that [fraudulent claims] were actually submitted and paid after [the relator] left his job"); *United States ex rel. Lord v. NAPA Mgmt. Servs.*, No. 3:13-2940, 2017 WL 5450757, at *9 (M.D. Pa. Nov. 14, 2017) (dismissing the relator's claims for the period before and after his employment because the relator "failed to plead any specific facts that would lead to a strong inference that [the defendants] submitted false claims prior [to or after the relator's employment]" and because there was no "indicia of reliability with respect to [the] relator's claims outside of" the time period of the relator's employment); *see also Wheeler*, 127 F.4th at 497–98. Therefore, Counts I and II are dismissed to the extent they concern events that occurred after Binns's termination and are, thus, limited to events that occurred during Binns's employment with SRHS.[9]

Moreover, the Court concludes that Binns has not adequately alleged presentment as to the Stark-AKS Scheme. As noted, under the AKS, "it is illegal for any person to knowingly solicit or receive remuneration in return for referring any good, facility, service, or item to someone that will be paid for, at least in part, by a Federal health care program." *Nicholson*, 42 F.4th at 194 (internal quotation marks omitted). And, "[i]n broad terms, the [Stark Law] prohibits physicians from making referrals to entities where the referring physician receives aggregate compensation that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the

---

[9] The Court notes that in *Lord*, on similar facts, the district court dismissed without prejudice the claims outside of the time period of the relator's employment and provided that the relator would be "permitted to amend his complaint if he c[ould] ascertain during discovery and then plead specific facts that show the time period regarding the alleged fraudulent billing scheme by [the defendants] began before his employment started and continued after his employment was terminated." *Lord*, 2017 WL 5450757, at *9. However, this Court follows the Fourth Circuit's path in *Wheeler*, where the Court simply limited the scope of the claims without allowing the relator to amend his pleadings after engaging in discovery. *See Wheeler*, 127 F.4th at 498.

entity furnishing the designated health services." *Drakeford*, 792 F.3d at 371 (cleaned up).

Most basically, Binns fails to meet the Rule 9(b) standard concerning presentment regarding the Stark-AKS Scheme because she has not alleged any indicia of reliability supporting an allegation that any objectionable referrals culminated in submission of claims to the Government Programs. Stated another way, she has not alleged any indicia of reliability that any claims submitted to the Government Programs were for patients who received objectionable referrals. *See Century Park*, 2025 WL 1959356, at *19 (dismissing FCA claims based on AKS violations when the relators did not adequately allege that any referrals resulted from the alleged gifts); *United States ex rel. Hagood v. Riverside Healthcare Ass'n, Inc.*, No. 4:11cv109, 2015 WL 1349982, at *9 (E.D. Va. Mar. 23, 2015) ("[T]o state an FCA claim, it is not enough for [r]elators simply to present allegations of a fraudulent scheme through which [the defendants] defrauded, or submitted illegal payment requests to, certain persons. Rather, [the relators] must allege facts permitting a reasonable inference that [the defendants'] alleged fraudulent scheme resulted in [the defendants] presenting a false claim *to Government Payors*, not merely persons in general." (citation omitted)); *United States ex rel. Rector v. Bon Secours Richmond Health Corp.*, No. 3:11-cv-38, 2014 WL 1493568, at *9 (E.D. Va. Apr. 14, 2014) ("[The relator's] claim does not involve an integrated scheme in which presentment of a claim [to Government Programs] for payment was a necessary result because the patients could have paid for the relevant prescriptions and procedures themselves."). Accordingly, the SAC fails to meet the Rule 9(b) standard concerning the Stark-AKS Scheme.

22

On this point, the Court notes that the SAC suggests several ways that Binns might have obtained information concerning SRHS Defendants' billing.  The SAC alleges that "Defendants utilize two forms of billing: hospital billing and professional billing," with the former including "technical component charges for supplies (some billed in Epic)" and the latter including "billing for the services in the anesthesia department from the CRNAs and MDAs." [Doc. 33 ¶ 197.]  The SAC alleges that Defendants have both hospital billing and professional billing departments and that "Binns met with personnel in these departments on several occasions." [*Id.*]  It also alleges that "[a]fter Epic was installed, a report for anesthesia billing was issued by SRHS and Binns had access to that report," which "listed all anesthesia billing cases and allowed Binns to monitor and verify *that billing was completed*." [*Id.* ¶ 214 (emphasis added).]  As discussed, the SAC alleges that Binns complained repeatedly to her superiors about billing fraud.  [*E.g.*, *id.* ¶¶ 62, 222, 233, 237–38, 246, 255.]  And she shared a dissertation with Brown and Jennings that contained sections related to medical direction, TEFRA guidelines, and billing for medical direction.  [*Id.* ¶ 223.]  Brown also discussed with Binns the findings of two companies that specialized in anesthesia billing following their review of SRHS's anesthesia billings. [*Id.* ¶¶ 224–25.]

Nonetheless, the SAC's allegations regarding the Stark-AKS Scheme lack any specific allegations of how Binns's access to billing information led her to conclude that SRHS Defendants submitted claims to the Government Programs for any patients that were referred to SRHS from the physician anesthesiologists with whom it had unlawful financial relationships and compensation arrangements.  For example, Binns does not allege that those allegations are supported by any medical or billing records that she

23

reviewed or any information given to her by people with first-hand knowledge. Counts I and II are therefore dismissed to the extent they concern the Stark-AKS Scheme.[10] *See Wheeler*, 127 F.4th at 498 (limiting the scope of the relator's claims to allegations concerning North Carolina facilities when the relator's allegations concerning the other facilities failed to meet the Rule 9(b) standard).

Based on the above analysis, the Court concludes that the SAC adequately alleges Counts I and II with respect to the Forged Records and Non-Performed Services Schemes for the time period during which Binns was employed by SRHS[11] and, thus,

---

[10] Because the Court concludes that Binns fails to adequately allege the fourth element of an FCA claim as to the Stark-AKS Scheme, the Court will not address SRHS Defendants' arguments regarding the other elements as to that scheme.

[11] Although SRHS Defendants also argue that the SAC fails to adequately allege that any SRHS Defendant had the requisite scienter at the time of presentment or that any false claim was material [Doc. 48-1 at 11, 19–25], the Court disagrees.

Defendants act with the scienter required for FCA liability if they "(1) have actual knowledge of the falsity of the information; (2) act in deliberate ignorance of the truth or falsity of the information; or (3) act in reckless disregard of the truth or falsity of the information." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 197 (4th Cir. 2022) (cleaned up). Critically, "[n]o proof of specific intent to defraud is required." *Id.* (internal quotation marks omitted). Here, the SAC alleges many false statements and fraudulent conduct the falsity of which would be plainly known by the anesthesiologists who made them. [*E.g.*, Doc. 33 ¶¶ 222, 233, 237–38, 246, 251–54, 256–58.] The allegations above also describe many occasions in which Binns informed her superiors at SRHS that anesthesiologists were repeatedly engaging in billing fraud by charting services they did not provide, including forging medical records to do so. [*E.g.*, *id.* ¶¶ 222, 223, 237–38, 246, 255.] And Binns alleges that two third-party companies supported her claims that such billing fraud was occurring at SRHS. [*Id.* ¶¶ 224, 225.] The Court therefore concludes that Binns has adequately pled scienter concerning the Forged Records and Non-Performed Services Schemes.

Within the meaning of the FCA, materiality means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Materiality "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Servs., Inc. v. United States*,

24

limits these claims to actions taken during Binns's employment related to the Forged

Records and Non-Performed Services Schemes.[12]   Having concluded that the SAC's

allegations are sufficient to state a claim as to Counts I and II with these limitations, the

---

579 U.S. 176, 193 (2016) (cleaned up).   Thus, whether satisfaction of a particular statutory, regulatory, or contractual requirement is an express "condition of payment is relevant, but not automatically dispositive." *Id.* at 194.  "[P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular . . . requirement.  Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Id.* at 194–95.  The SAC adequately alleges materiality as to the Forged Records Scheme by alleging examples of anesthesiologists representing that they had performed services that they actually had not performed.  And it adequately alleges materiality as to the Non-Performed Services Scheme for similar reasons.  Although SRHS Defendants contend that "Binns does not allege that compliance with TEFRA is a condition of payment" [Doc. 48-1 at 25], the reimbursement rate for medical supervision is lower than the medically directed rate, *United States ex rel. Mamalakis v. Anesthetix Mgmt. LLC*, 20 F.4th 295, 298 (7th Cir. 2021) (citing 42 C.F.R. §§ 414.46(d)(3)(v), (f)).  Binns alleges that the Government will pay for medical direction only if the services satisfy the TEFRA rules and that "[t]he anesthesiologist alone must document and attest in the patient's medical record that the seven TEFRA requirements . . . have been satisfied." [Doc. 33 ¶¶ 158–59.]  It follows that billing for "a more expensive service (medical direction) after performing less costly services (medical supervision)" amounted to a material misrepresentation because, without the representation that the TEFRA rules were satisfied, the Government Programs would not have paid for medical direction.  *Lord*, 2017 WL 5450757, at *14 (concluding that the relator had adequately alleged materiality when he alleged that providers billed for medical direction when the TEFRA rules had not been satisfied); *see also United States v. Walgreen Co.*, 78 F.4th 87, 94 (4th Cir. 2023) ("[T]he very act of falsifying records to feign compliance with requirements suggests that [the defendant] itself thought that those requirements were material.").  Accordingly, the Court concludes that Binns has adequately alleged materiality regarding the Forged Records and Non-Performed Services Schemes.

[12] Although Foothills has not joined in SRHS Defendants' motion to dismiss, the Court limits Counts I and II as against Foothills as well, for the same reason.  *See Hill v. United Air Lines, Inc.*, No. 2:10-cv-3243-RMG-BM, 2011 WL 1113499, at *2 (D.S.C. Mar. 24, 2011) ("Although [a particular defendant] has not joined in the motion to dismiss, the same law and reasoning applies and thus also precludes [the] plaintiff's claim against [the non-moving defendant].").

25

Court next turns to whether the SAC's allegations against the Individual Defendants are sufficient.

### *Whether the Allegations Are Sufficient as Against the Individual Defendants*

The SAC suffers from at least one critical flaw: it alleges that the "Defendants"—collectively, and without distinction—all individually engaged in conduct violative of the FCA. As such, the count sections are nothing more than legal conclusions broadly alleging Defendants' conduct, Defendants' knowledge, and Defendants' violations without the requisite specificity.

Importantly, under Rule 9(b) an FCA relator must identify, with particularity, "each individual defendant's culpable conduct; defendants cannot be grouped together without specification of which defendant committed which wrong." *United States ex rel. Ahumada v. NISH*, 756 F.3d 268, 281 n.9 (4th Cir. 2014) (internal quotation marks omitted); *see also United States v. Gwinn*, No. 5:06-cv-00267, 2008 WL 867927, at *10 (S.D. W. Va. Mar. 31, 2008) ("In cases where there are multiple defendants, a complaint fails to meet the particularity requirements of Rule 9(b) when a plaintiff asserts merely conclusory allegations of fraud against multiple defendants without identifying each individual defendant's participation in the alleged fraud." (cleaned up)). Additionally, "a relator in an FCA case must show an affirmative act going beyond mere passive acquiescence." *United States ex rel. UPPI, LLC v. Cardinal Health, Inc.*, No. 9:22-cv-03770-BHH, 2023 WL 12207831, at *5 (D.S.C. Aug. 14, 2023) (cleaned up). "This requirement strikes the appropriate balance between shielding from liability parties who merely fail to prevent the fraudulent acts of others[] and ensuring that liability attaches for affirmative acts that do cause or assist the presentation of a fraudulent claim." *Id.* (internal quotation marks

26

omitted).  For this reason, "it is sufficient to allege that the defendant's conduct was at least a substantial factor in causing the submission of false claims." *Id.* (internal quotation marks omitted).

The Court concludes that the factual allegations against the Individual Defendants are insufficient to state a claim as to Counts I and II, as the Court will discuss.

### Holstien, Dr. Davis, Feisal, and Jennings

The SAC does not identify any basis for inferring that Holstien, Dr. Davis, Feisal, or Jennings took any affirmative act to make any fraudulent statement or fraudulent course of conduct.  As for Holstien and Dr. Davis, the SAC primarily alleges the respective positions that they held at SRHS and who they supervised and as well as conclusory allegations that they were "aware of, expressly or tacitly approved, and/or participated in the [three alleged schemes]." [*Id.* ¶¶ 38, 41–43, 47–49, 53.]  The SAC alleges a few more facts concerning Feisal and Jennings, but none relating to affirmative actions that they took.  [*See id.* ¶¶ 44–46, 50–52, 220–25, 237, 239.]  In early 2019, Feisal and Jennings received a third-party consultant report that "included recommendations to prevent fraudulent billing that was occurring"; and in late 2020, they received a different third-party consultant report that contained recommendations for the anesthesia department, including anesthesia billing.  [*Id.* ¶¶ 224–25.]  The SAC alleges that Binns reported billing fraud to Jennings on several occasions; that she communicated with Jennings regarding how SRHS could stop billing fraud; and that despite Feisal and Jennings receiving recommendations from the third-party consultants regarding steps SRHS could take to stop billing fraud, SRHS did not follow the companies' recommendations.  [*Id.* ¶¶ 222–25, 237, 239.]  Because the SAC fails to allege any affirmative action by Holstien, Dr. Davis,

27

Feisal, or Jennings in support of the alleged fraudulent schemes, Count I and II are dismissed as to these four Defendants.  *See UPPI*, 2023 WL 1220781, at *5.

<u>Dr. Teel</u>

With respect to Dr. Teel, the SAC alleges Dr. Teel's position at SRHS and who she reported to as well as conclusory allegations that she was "aware of, expressly or tacitly approved, and/or participated in the [three alleged schemes]." [*Id.* ¶¶ 53–55.]  The SAC also alleges that Dr. Teel worked on a case at the end of 2021 that was improperly billed as medical direction (the "end-of-2021 treatment") and that Binns alerted Dr. Teel to the billing impropriety; that when Dr. Teel was called for emergence while she was in meetings, she would remain in the meetings and not call anyone else to attend; that from January 1, 2019, to July 14, 2022, Dr. Teel would provide lunch breaks or non-lunch breaks to CRNAs while medically directing other CRNAs and that she knew that was a system-wide practice; that Dr. Teel received reports of various fraudulent billing activities, including from Binns, from early 2017 through 2022; that Dr. Teel violated TEFRA requirements for patients who, upon information and belief, were Medicaid patients; and that Dr. Teel was signed in on the medical charts on cases in which she actually was not present.  [*Id.* ¶¶ 62, 221, 243, 246, 255, 301–05, 323, 329.]

These allegations fail to meet the Rule 9(b) standard.  The allegations that Dr. Teel received reports of fraud [*id.* ¶¶ 246, 255, 323, 329] lack allegations of "an affirmative act going beyond mere passive acquiescence."  *UPPI*, 2023 WL 12207831, at *5 (internal quotation marks omitted).  Regarding the allegations that Dr. Teel failed to provide particular services or did not satisfy the TEFRA rules [*id.* ¶¶ 62, 221, 243, 301–05], the SAC contains no reliable indicia leading to a strong inference that any false claim was

28

actually presented to the Government Programs, including no allegation that Dr. Teel charted any of these cases inappropriately. In fact, Binns's only allegations of false claims presented to the Government Programs as a result of Dr. Teel's non-performance of services are made "upon information and belief." [*Id.* ¶¶ 210, 305.]

Binns's pleading deficiencies in this regard are similar to those concerning the Stark-AKS Scheme outlined above. Binns fails to allege either that she has first-hand knowledge, that any record she viewed supports the proposition that Dr. Teel falsely charted any of these cases, or that she was informed of the facts by a person who was in a position to know. *Cf. Wheeler*, 127 F.4th at 488 (holding that the relator adequately pled that fraudulent therapy notes were being created at the defendant's North Carolina clinics when the pleading alleged that the director of one of the clinics informed the relator of that fact). As Chief CRNA—as of July 2016 [*id.* ¶ 21]—one would expect that Binns also could have obtained information from her CRNAs, particularly those involved with a specific case. However, Binns does not allege that she obtained such information from other CRNAs in any of these cases involving Dr. Teel. The silence of the SAC on these points is deafening, and the lack of specificity regarding so many of these allegations stands in stark contrast to the July 2022 Conduct.[13] Because the SAC does not allege

---

[13] As noted earlier, the SAC alleges that on July 1, 2022, there were five anesthesia cases running concurrently; Dr. English's name was on the record for one of those cases—for a Medicare patient—and she was listed as medically directing a CRNA, but in fact Dr. English was not in the building for the entire case; Dr. Hauck was the only anesthesiologist in the building, and he was supervising CRNAs in the other four cases under medical direction, two of which included Medicare patients; despite the fact that Dr. English was not in the building for part of the treatment, Dr. English was billed as providing medical direction; and despite the fact that Dr. Hauck was supervising CRNAs in more than four cases while Dr. English was out of the building, Dr. Hauck was billed as providing medical direction as well. [*Id.* ¶¶ 251–60.] Unlike many of the SAC's other allegations, these allegations are accompanied by reliable indicia that lead to a strong inference that claims

29

facts indicating similar support for its allegations against Dr. Teel, Counts I and II are dismissed as against her.  *See United States v. Liberty Ambulance Serv.*, No. 3:11-cv-587-J-32MCR, 2016 WL 81355, at *3–5 (M.D. Fla. Jan. 7, 2016) (dismissing FCA claims when relators had no "supporting information from anyone 'with first-hand knowledge' of [the defendant's] internal billing practices").

Aycock

With respect to Aycock, the SAC alleges that Aycock was SRHS's chief operating officer, who he reported to, and who reported to him as well as conclusory allegations that he was "aware of, expressly or tacitly approved, and/or participated in the [three alleged schemes]."  [*Id.* ¶¶ 38–40, 44.]  The SAC alleges that Aycock signed contracts on behalf of SRHS with Foothills whereby SRHS and Foothills partnered or contracted with one another to bill the federal government for anesthesia services that SRHS provided.  [*Id.* ¶¶ 59–60, 191.]  The SAC also alleges that Aycock signed the contracts knowing that they violated the Stark Law, the AKS, and the FCA because of direct and indirect compensation arrangements in which the anesthesiologists were being paid more than fair-market-value compensation under the contract.  [*Id.* ¶¶ 338, 340–41.]

---

were actually submitted.  Initially, regarding each of the cases, the SAC identifies the procedure that was performed, the operating room where the procedure took place, and which doctor was listed as medically directing which number of CRNAs.  [*Id.* ¶¶ 256–60.] The SAC also alleges that on the day in question "CRNA Amber Mulak reported to Binns that [Dr. English] was not in the building"; that Binns spoke to the charge CRNA Fred Amatriain, who told Binns he had "informed Dr. Hauck that Dr. English was leaving the hospital premises, and there were five concurrent cases ongoing, at least three of which involved Medicare patients" and Dr. Hauck told Amatriain that "Dr. English's absence was 'not a problem'"; and Binns's "review of the medical records and charts confirmed [Binns's] understanding that TEFRA violations, forged medical charts indicating anesthesia service that had not been performed, and Medicare billing fraud had occurred."  [*Id.* ¶¶ 251, 253, 254.]

It appears that Binns's theory regarding Aycock may be that he is liable because he signed the contracts creating the financial circumstances whereby the Stark Law and AKS would have prohibited submitting claims *to the Government Programs* for services that resulted from referrals to SRHS of designated health services. [*Id.* ¶ 364 ("[A]ll of SRHS's submissions for payment or approval to federal health care insurance programs for claims arising from DHS referrals to SRHS from physicians participating in the unlawful Stark-AKS Scheme were materially false and fraudulent and in knowing violation of the FCA.").] However, for the reasons the Court has already explained as to the SAC's general allegations, Binns fails to state a claim concerning the Stark-AKS Scheme because she fails to satisfy the Rule 9(b) standard regarding whether any claims submitted to the Government Programs were for services that resulted from the alleged improper referrals. Accordingly, Counts I and II are dismissed as to Aycock.

**Count III**

Count III alleges a reverse false claim. [Doc. 33 ¶¶ 379–85.] SRHS Defendants contend that Binns's reverse false claim fails because it is predicated on the same conduct as her other FCA claims. [Doc. 48 at 26–27.] The Court agrees the reverse false claim should be dismissed.

"A reverse false claim flips the typical claim under the [FCA]: Direct false claims cause the United States to remit money directly to claimants, whereas reverse false claims facilitate the improper withholding of money or property to which the United States is entitled." *Wheeler,* 127 F.4th at 495 (cleaned up). "A [defendant] may be held liable for a reverse false claim if it: (1) 'knowingly makes, uses, or causes to be made or used, a false record or statement material to an *obligation to pay* or transmit money or property

31

to the Government;' or (2) 'knowingly conceals or knowingly and improperly avoids or decreases an *obligation to pay* or transmit money or property to the Government.'" *Id.* (quoting 31 U.S.C. § 3729(a)(1)(G)).

Here, Count III fails because Binns has not alleged any obligation to pay or transmit money or property to the Government. The FCA defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). "[A]s a matter of law the Government's ability to pursue reimbursement for overpayments or fraudulently induced payments does not constitute an obligation" in the context of a reverse false claim. *United States ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 191 (D. Md. 2019) (internal quotation marks omitted). When a relator simply alleges that a defendant overcharged the Government and failed to repay, without alleging any separate obligation to pay, "courts have consistently dismissed the reverse FCA claim as redundant." *United States ex rel. Harbit v. Consultants in Gastroenterology, P.A.*, No. 3:19-cv-03403-JMC, 2021 WL 1197124, at *8 (D.S.C. Mar. 30, 2021) (cleaned up); *see United States ex rel. Kyer v. Thomas Health Sys., Inc.*, 756 F. Supp. 3d 75, 91 (S.D.W. Va. 2024) ("The FCA does not contain a two-for-one deal.").

Accordingly, the Court concludes the SAC fails to state a claim under a reverse FCA theory. Therefore, Binns's reverse false claim is dismissed, including as against Foothills, *see Hill*, 2011 WL 1113499, at *2.

32

**Count IV**

"To state a[n] FCA conspiracy claim under 31 U.S.C. § 3729(a)(1)(C), a relator must show (1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim reimbursed by the Government, and (2) at least one act performed in furtherance of that agreement." *Mathewson*, 2023 WL 9060896, at \*12 (cleaned up). Moreover, a plaintiff asserting an FCA conspiracy claim "must show that the conspirators agreed to make use of the false record or statement to achieve this end." *Id*. (internal quotation marks omitted). "The conspirators must have shared a specific intent to defraud the Government." *Id*. (internal quotation marks omitted). "The particularity requirements of Rule 9(b) apply to the FCA's conspiracy provision with equal force as to its presentment and record provisions." *Id.* (cleaned up).

Upon review of the SAC, the Court observes that Binns's allegations do not create a reasonable inference that Defendants shared a specific intent to defraud the Government. *See, e.g., United States ex rel. Campbell v. KIC Dev., LLC*, EP-18-CV-193-KC, 2019 WL 6884485, at \*16 (W.D. Tex. Dec. 10, 2019) ("The fact that multiple people caused similar false claims to be submitted over a similar period of time does not, by itself, do more than point to a possibility of an agreement among them." (internal quotation marks omitted). Specifically, the Court concludes that the SAC includes general allegations regarding Defendants' alleged schemes but lacks allegations describing any meeting of the minds by Defendants. *See United States ex rel. Godfrey v. KBR, Inc.*, 360 F. App'x 407, 413 (4th Cir. 2010) (dismissing an FCA conspiracy claim when the complaint "failed to provide sufficient facts giving rise to an inference of a meeting of the minds" (internal quotation marks omitted)). Binns provides no factual allegations to

33

support a reasonable inference that Defendants were engaged in a conspiracy and instead alleges a conspiracy only in conclusory terms.  At best, she alleges that Defendants all engaged in simultaneous conduct.  Accordingly, the Court concludes that the SAC fails to state a claim for conspiracy to commit FCA violations, and thus Count IV is dismissed as against the SRHS Defendants.  Based on the same reasoning, Count IV is also dismissed as against Foothills.  *See Hill*, 2011 WL 111349, at *2.

**Count V**

SRHS Defendants contend Binns's FCA retaliation claim should be dismissed because she has failed to allege she engaged in protected activity.  [Doc. 48-1 at 28–29.] According to SRHS Defendants, Binns's job was to inform SRHS leadership of the feedback she received from the 100 people she supervised, and she offers no factual support to show that she did anything more than provide suggestions for improvement and generally report about feedback she had heard from the staff she was managing, which were both part of her regular job duties.  [*Id*. at 29.]  Additionally, SRHS Defendants contend Binns has failed to sufficiently plead that SRHS knew she was engaged in a protected activity in furtherance of an FCA claim.  [*Id*. at 29–31.]  Lastly, SRHS Defendants argue that even if Binns has sufficiently pled a retaliatory discharge claim, such claim against the Individual Defendants must fail as there is no evidence of congressional intent to expand the class of potential defendants beyond the employer. [*Id*. at 31–32.]

The Court will first address whether Count V should be dismissed as against SRHS because Binns has not adequately alleged that she engaged in protected conduct or that

34

Defendants had notice that she had engaged in such conduct. The Court then will address SRHS Defendants' arguments specifically relating to the Individual Defendants.

### *Whether Binns Has Sufficiently Pled a Retaliatory Discharge Claim Against SRHS*

Initially, the Court notes that FCA retaliation claims need only meet the pleading standard in Rule 8(a), not Rule 9(b)'s heightened pleading standard. *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015). To state a claim for unlawful retaliation, a whistleblower plaintiff must allege that: (1) she engaged in protected activity; (2) her employer knew that she was engaged in protected activity; and (3) her employer took adverse action against her as a result of her protected activity. *Id.*

The FCA "defines two types of protected activity—acts in furtherance of an FCA action . . . or other efforts to stop 1 or more FCA violations . . . ." *Grant*, 912 F.3d at 200 (cleaned up). This second type "encompasses a much broader array of activity—conduct in which efforts are motivated by an objectively reasonable belief that the employer is violating or will violate the FCA." *United States ex rel. Miller v. Reckitt Benckiser Grp. PLC*, 698 F. Supp. 3d 889, 918 (W.D. Va. 2023). Under this test, "while the plaintiff's actions need not lead to a viable FCA action as required under the distinct possibility standard, they must still have a nexus to an FCA violation." *Grant*, 912 F.3d at 202 (internal quotation marks omitted). "Internal reporting of violations can constitute protected activity, but merely expressing concern about regulatory non-compliance is not enough. *Miller*, 698 F. Supp. 3d at 918. "[A]n act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA." *Grant*, 912 F.3d at 201–02. A plaintiff pleads facts that satisfy this standard when she "alleges facts sufficient to show that [she] believed [her] employer was

violating the FCA, that this belief was reasonable, that [she] took action on that belief, and that [her] actions were designed to stop one or more violations of the FCA." *Id.*

Notice is viewed from the employer's perspective and turns on whether the employer is on notice that litigation is a reasonable possibility. *United States ex re. Parks v. Alpharma, Inc.*, 493 F. App'x 380, 388 (4th Cir. 2012). Such notice can be accomplished by "expressly stat[ing] an intention to bring a *qui tam* suit" or "by any action which a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility." *Id.* (internal quotation marks omitted).

In this case, the Court concludes that Binns has adequately alleged that SRHS had notice that she had engaged in activity protected by the FCA. The SAC alleges many instances where Binns reported billing fraud—including characterizing the conduct as fraudulent—and otherwise attempting to stop it from continuing. [*See*, *e.g.*, Doc. 33 ¶¶ 62 ("[Binns] reported this billing fraud incident to Dr. Teel."), 222 ("In early 2019, Binns reported Medicare Fraud on several occasions, particularly to [Jennings and Brown]."), 224 (describing suggestions Binns made in early 2019 to stop the billing frauds she had previously identified and reported, including suggesting to Jennings and Brown that SRHS talk to a company that specialized in anesthesia billing to review SRHS's anesthesia billing), 233 (alleging that Binns reported a pattern of conduct by a doctor who fraudulently charted C-section records to show that he was present for the entire procedure), 237–38 (alleging that Binns reported to Jennings, Brown, and Medical Director Dr. Adam Evec that medical direction would be billed for one doctor when there was actually no anesthesiologist in the facility for some of the time billed), 239 (alleging Binns's reporting of similar fraud), 246 (alleging that Binns reported to Earles in June 2022

36

that doctors were fraudulently forging and changing procedure notes to show that doctors had performed procedures that had in fact been completed by CRNAs).  In fact, Binns alleges that around late 2020, SRHS hired a company to review its anesthesia department as a whole, including billing, as a result of "[Binns's] suggestion in an effort to help address and stop the billing frauds Binns had previously identified and reported."  [*Id.* ¶ 225.]

Binns alleges that Jennings and Brown, in particular, received many of her reports of fraudulent billing.  [*Id.* ¶¶ 221, 222, 237, 238, 239.]  And Binns specifically shared a dissertation with Brown and Jennings, noting the sections that related to medical direction, TEFRA guidelines, and billing for medical direction.  [*Id.* ¶ 223.]  She also alleges she sent an email to Dr. Teel and Earles on July 7, 2022, just days before Binns was terminated, in which she reported, in significant detail, conduct that she informed them "could be considered billing fraud" [*id.* ¶ 255 (internal quotation marks omitted) (emphasis omitted)], prompting Dr. Teel to indicate that there would be an investigation of the billing fraud Binns had reported [*id.* ¶ 265].

Given Binns's alleged repeated communications with several of her superiors in furtherance of her attempts to end SRHS's fraudulent billing and that Dr. Teel announced—the day before Binns was terminated—that an investigation would be conducted of the fraud Binns had reported, the Court concludes the SAC adequately alleges that Binns engaged in protected conduct and that Defendants had notice of that fact.  *See Grant*, 912 F.3d at 203 (holding that the relator adequately alleged that his employer knew of his protected activity when he alleged he "complained to . . . management on numerous occasions in person and in writing about the company's

allegedly fraudulent conduct" and "[a]t least some of his complaints triggered an investigation"); *Nifong v. SOC, LLC*, 190 F. Supp. 3d 549, 559 (E.D. Va. 2016) (holding that the plaintiff's allegations were sufficient when he "made several reports to his supervisors characterizing defendant's billing practice as fraudulent and suggesting that it should be corrected" (cleaned up)).  Accordingly, SRHS Defendants' motion to dismiss is denied as to Count V as against SRHS.

### Whether Binns May Bring a Retaliatory Discharge Claim Against the Individual Defendants or Foothills

The SRHS Defendants argue that, even to the extent that the SAC states a claim for FCA retaliation against SRHS, it does not state a claim against the Individual Defendants because only an employer can be liable for retaliation under the FCA and because the SAC does not allege that any of the Individual Defendants were involved in Binns's termination in any event.  [Doc. 48-1 at 15–16, 17–18, 19.]

The Court agrees that dismissal of Count V against the SRHS Defendants other than SRHS is warranted.  As SRHS Defendants point out, the SAC does not allege that any of the Individual Defendants were involved in her termination.[14]  Accordingly, Count V is dismissed as to the Individual Defendants, and it is dismissed as to Foothills for the same reason, *see Hill*, 2011 WL 1113499, at *2.

**Count VI**

SRHS Defendants argue that Binns's wrongful discharge in violation of public policy claim fails because such claim cannot be maintained where a specific statutory

---

[14] Additionally, the Court agrees with the majority view that 31 U.S.C. § 3730(h) does not create a cause of action against supervisors in their individual capacities.  *See, e.g.*, *Rangarajan v. Johns Hopkins Health Sys. Corp.*, No. WMN-12-1953, 2014 WL 6666308, at *6 (D. Md. Nov. 21, 2014).

right has been created. [Doc. 48-1 at 32–33.] SRHS Defendants also maintain that this claim fails because Binns has failed to sufficiently plead that she was engaged in any activity other than her regular job duties. [*Id.* at 33.] And to the extent Binns bases this claim on the allegation that she refused to participate in illegal activities in violation of public policy, SRHS Defendants argue she has failed to allege any facts in support of that conclusion. [*Id.*]

In response, Binns agrees that a wrongful discharge in violation of public policy claim cannot be maintained if the underlying violation of public policy has an existing statutory remedy. [Doc. 55 at 30.] However, she contends her wrongful discharge in violation of public policy claim is not based on her FCA protected activities, but on her refusal to participate in SRHS Defendants' "illegal activities" and "illegal business activities" in violation of various federal and state statutes including 18 U.S.C. §§ 1341, 1343, 1035, 371 and 2 as well as S.C. Code §§ 43-7-60, 38-55-540, and 16-17-41. [Doc. 55 at 30–31.]

In South Carolina, an at-will employee may be terminated for any reason or no reason at all. *Ludwick v. This Minute of Carolina, Inc.,* 337 S.E.2d 213, 214 (S.C. 1985). Under the "public policy exception" to the at-will employment doctrine, an at-will employee has a cause of action in tort for wrongful termination "[w]here the retaliatory discharge of [the] at-will employee constitutes violation of a clear mandate of public policy." *Id.* at 216. "The public policy exception clearly applies in cases where either: (1) the employer requires the employee to violate the law, or (2) the reason for the employee's termination itself is a violation of criminal law." *Barron v. Labor Finders of S.C.,* 713 S.E.2d 634, 637 (S.C. 2011).

39

A common law claim for termination in violation of public policy is available only when there is no corresponding statutory remedy. *Barron,* 713 S.E.2d at 637. For example, the Supreme Court of South Carolina held an employee could not maintain an action for termination in violation of public policy where the employee alleged he was terminated for filing a complaint under the FLSA because the FLSA provided a remedy for wrongful discharge. *Dockins v. Ingles Markets, Inc.,* 413 S.E.2d 18 (S.C. 1992). In contrast, the court agreed with the South Carolina Court of Appeals that the South Carolina Payment of Wages Act would not prohibit an employee from maintaining a termination in violation of public policy claim because that act did not provide a remedy for wrongful termination. *Barron,* 713 S.E.2d at 638.

The Court agrees with Binns that the SAC bases this claim on her alleged "refusal to participate in the ongoing illegal business practices of SRHS" that "violated multiple federal and state statutes." [Doc. 33 ¶¶ 404–05; *see id.* ¶¶ 403–08.] The SAC, however, does not plausibly allege that there were any illegal practices in which Binns was asked to participate. Accordingly, the Court dismisses Count VI as against the SRHS Defendants. *See Desmarais v. Sci. Rsch. Corp.*, 145 F. Supp. 3d 595, 600 (D.S.C. 2015) ("[T]here is no clear mandate of public policy supporting wrongful termination in violation of public policy claims of employees who report the alleged illegal conduct of their coworkers."). And because the same reasoning warrants dismissal of this claim against Foothills, Count VI is dismissed as to Foothills as well. *See Hill*, 2011 WL 1113499, at *2.

**Leave to Amend to Cure Defects in Dismissed Claims**

Given the Court's rulings that Binns has failed to adequately plead Counts III, IV, and VI as to any Defendant; Counts I, II, and V as to the Individual Defendants; and Count V as to Foothills, the Court must now consider whether to grant Binns leave to amend the SAC to attempt to cure its deficiencies.  SRHS Defendants argue that Binns's claims should be dismissed with prejudice because amendment would be futile.  [Doc. 48-1 at 33–34.]  In her response, Binns requests that to the extent the Court concludes she has failed to state a claim, she be allowed to cure any defects with further amendment.  [Doc. 55 at 34.]

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, "[a] party may amend its pleading once as a matter of course" under timelines not applicable here no later than . . . 21 days after serving it" or with the court's leave.  In the latter instance, "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2). Following a dismissal under Rule 12(b)(6), a court "normally will give plaintiff leave to file an amended complaint" because "[t]he federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that plaintiff be given every opportunity to cure a formal defect in his pleading." *Ostrzenski v. Seigel*, 177 F.3d 245, 252–53 (4th Cir. 1999) (internal quotation marks omitted) (emphasis omitted). "Likewise, typically, failure to plead fraud with particularity does not support a dismissal with prejudice.  To the contrary, leave to amend is almost always allowed to cure deficiencies in pleading fraud." *Hagood*, 2015 WL 1349982, at *16 (cleaned up).  Still, "a district court may deny leave to amend if the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the

41

amendment would have been futile." *Nathan*, 707 F.3d at 461 (internal quotation marks omitted).

Here, there is no evidence of bad faith on Binns's part and the Court sees no reason to believe amendment would be prejudicial. Nor can the Court conclude that amendment would be futile. Although Binns has filed two amended complaints, "this is not a case in which [Binns] had notice of any deficiencies in the [SAC] prior to the resolution of the instant motion." *Hagood*, 2015 WL 1349982, at *16. Accordingly, the Court concludes it is possible that Binns will be able to supply factual allegations that will cure the deficiencies the Court has identified. Thus, the dismissal of Binns's claims pursuant to this Opinion and Order is without prejudice, and Binns is granted leave to file a third amended complaint.

**Shotgun Pleading**

SRHS Defendants contend that, in the event that the Court does not dismiss the SAC for failure to state a claim, the Court should order Binns to correct her "shotgun complaint" pursuant to Rule 12(e) of the Rules of Federal Civil Procedure. [Doc. 48-1 at 34–35]; *see* 5C Arthur R. Miller & A. Benjamin Spencer, Federal Practice and Procedure § 1376 (3d ed. 2026) ("Rule 12(e) motions are particularly useful when addressing so called 'shotgun pleadings,' and some courts have ordered repleading when faced with such complaints.").

A "shotgun pleading" is "one that fails to articulate claims with sufficient clarity to allow the defendant to frame a responsive pleading or one in which it is virtually impossible to know which allegations of fact are intended to support which claims for relief" and is prohibited by Rules 8 and 10 of the Federal Rules of Civil Procedure.

42

*Pendarvis v. Wilson*, No. 2:22-cv-03142-BHH-MHC, 2023 WL 11988175, at *3 (D.S.C. Aug. 11, 2023) (internal quotation marks omitted); *cf. Code v. Adidas Am., Inc.*, No. 6:23-4997, 2024 WL 637356, at *4 (D.S.C. Jan. 11, 2024) (stating that a complaint must "connect [the] facts with the necessary elements of the claim to put a defendant on sufficient notice of the allegations asserted against him"). There are four categories of shotgun pleadings: "(1) a complaint containing multiple counts where each count adopts the allegations of all preceding counts; (2) a complaint that is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; (3) a complaint that does not separate into a different count each cause of action or claim for relief; and (4) a complaint that asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Bartol v. Barrowclough*, 251 F. Supp. 3d 855, 859 (E.D. Pa. 2017) (cleaned up). "The unifying characteristic of these four types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* (internal quotation marks omitted).

As noted, the SAC does not specify which counts are brought against which Defendants, nor does it specify which factual allegations are the basis of which claims. Indeed, these deficiencies have contributed in no small part to the complete or partial dismissal of some of Binns's claims. Accordingly, Binns's third amended complaint shall set out each of her claims against each Defendant, making clear which claims are asserted against which Defendant and providing the facts relevant to each Defendant that support the claim against that Defendant. Where the claim is governed by Rule 9(b), the

43

pleading should also allege with appropriate specificity the facts that support the plausibility of her allegations that Defendants' billing and other alleged conduct occurred as she alleges and that each specific Defendant acted with the requisite scienter.

## CONCLUSION

Wherefore, based on the above, SRHS Defendants' motion to dismiss [Doc. 48] is GRANTED IN PART and DENIED IN PART. The Court dismisses without prejudice all claims against Defendants Mark Aycock, Dr. Dean Davis, Phil Feisal, Mary Jane Jennings, Dr. Nickole Teel, and Bruce Holstien; Counts III, IV, and VI as against SRHS; and Counts III, IV, V, and VI as against Foothills. Additionally, Counts I and II as against SRHS and Foothills are limited to conduct during the time of Binns's employment with SRHS that was related to the Forged Records and Non-Performed Services Schemes. However, the motion to dismiss is otherwise denied as to Counts I and II as against SRHS and Foothills, and it is denied as to Count V as against SRHS. The Court further directs Binns to file a third amended complaint by August 24, 2026 that complies with the instructions outlined in this Opinion and Order. Foothills' motion for judgment on the pleadings [Doc. 56] and Binns's motion to strike or deny Foothills' motion or, in the alternative, to extend Binns's deadline for responding to the motion [Doc. 58] are both FOUND AS MOOT.[15]

---

[15] These motions are moot because they are directed at the SAC, which will be superseded by the third amended complaint. *See, e.g.*, *Hall v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW*, No. 3:10-cv-418-RJC-DSC, 2011 WL 4014315, at *1 (W.D.N.C. June 21, 2011) (denying as moot the defendants' motions to dismiss because the second amended complaint rendered moot the defendants' pending motions to dismiss, which were related to the superseded complaint); *McCoy v. City of Columbia*, No. 3:10-132-JFA-JRM, 2010 WL 3447476, at *1–2 (D.S.C. Aug. 31, 2010) (adopting the magistrate judge's report and recommendation to the extent it

IT IS SO ORDERED.

s/Jacquelyn D. Austin
United States District Judge

July 31, 2026
Greenville, South Carolina

---

recommended that the motion to dismiss be found as moot because the amended complaint superseded the original complaint and rendered any attack upon it moot).